## Illinois Central Railroad Company v. Hedwig Johnson, Administratrix.

### Gen. No. 12,106.

1. ALIGHTING—*duty of carrier to passengers in act of.* Where passengers are alighting from a train at a point where it is necessary that they cross other tracks of the carrier, it is the duty of the operatives of a train approaching upon another track from the opposite direction, to exercise a degree of care commensurate with the situation and the danger, and it is negligence to operate such a train at a rate of speed from twelve to fifteen miles per hour at the point where such alighting passengers are required to cross, and are actually crossing.

2. CONTRIBUTORY NEGLIGENCE—*what not, as a matter of law.* It is not contributory negligence as a matter of law for one crossing a railroad track not to look to ascertain whether a train is approaching; but whether it is contributory negligence is a question for the jury, to be determined from all the facts and circumstances in evidence.

3. CONTRIBUTORY NEGLIGENCE—*when passenger not guilty of, in alighting from railroad train.* A passenger is not guilty of contributory negligence in alighting from a train upon which he has been carried as a passenger at a point where he was expressly directed by the carrier to alight.

4. MINOR—*degree of care to be exercised by.* A minor is only bound to use such care as children of his age, capacity and intelligence are capable of exercising.

5. VERDICT—*when not excessive.* A verdict for $5,000 rendered in an action instituted for death caused by the alleged wrongful act of the defendant, is not excessive where it appears that the plaintiff's intestate at the time of the accident was fourteen years of age, had been attending school since the age of six, was in the eighth grade at the time of his death, healthy, bright and intelligent, and left him surviving a father, mother and a sister aged twenty-one years.

Action on the case for death caused by alleged wrongful act. Appeal from the Circuit Court of Cook County; the Hon. JULIAN MACK, Judge, presiding. Heard in this court at the October term, 1904. Affirmed. Opinion filed November 2, 1905.

**Statement by the Court.** This is an action for negligence alleged to have caused the death of appellee's intestate, George Johnson, who was also her son. The declaration consists of only one count, to which appellant first demurred, but afterward withdrew its demurrer and pleaded not guilty. The jury found for appellee and

assessed the damages at the sum of $5,000, and the court after overruling appellant's motion for a new trial, rendered judgment on the verdict.

George Johnson was run over and killed by a south-bound train of appellant near the railroad station at Pullman, in Cook County, in the evening of November 3, 1900, about 7:47 o'clock. The appellant has two main tracks at Pullman. The most westerly is called number 1 and is the south-bound track. Track number 2 is next east of number 1, and is the north-bound track. Between these tracks there is an elevated platform. Frank A. Hitz, the conductor of the south-bound train which killed appellee's intestate, testified that the platform is about 350 feet long, between sixteen and eighteen feet wide and about four feet high; also, that the cars were so constructed that when passengers went from the car, when the apron of the steps was down, they stepped right onto the platform. He defines apron thus: "An apron is what flops down and makes it level with the platform floor;" and says, "When the apron was closed down, that makes the car platform level with the station platform." The apron, when turned down, is a continuation of the car platform over the steps, and when turned back, it rests on the car platform.

The evidence shows that, when the apron is down, passengers alight from a north-bound train onto the elevated platform between the tracks. Passengers alighting from a north-bound train onto the station platform have to walk to the south end of the platform, then to the ground, and then across the south-bound track to a turnstile, going through which they would come to 111th street, on the north side of which the depot is. All passengers alighting from a north-bound train, intending to go west, must cross the south-bound track, and all passengers desiring to take a north-bound train at Pullman, must, before they reach the elevated station platform, cross the south-bound track. At the north end of the platform there is a picket fence about six or seven feet high across the space between the tracks.

It appears from the evidence that Governor Yates was going to speak at Pullman in the evening of November 3, 1900, and that the deceased was one of a company of about sixty persons who boarded the north-bound train at West Pullman to go to Pullman, where, as one of them testified, they "were going to make a demonstration." The company seems to have been a political marching club, and they wore uniforms and had flags and a fife and drum with them. The deceased, with other members of the company, boarded the car next to the engine, the seats of which ran along the sides of the car. The north-bound train consisted of a locomotive engine and six cars. In the front car, in which George Johnson rode, this notice was displayed: "Passengers are forbidden to go out on the platform while the train is in motion; to facilitate movement, they are to leave the car at the forward end." Pullman was called as the train was being pulled into Pullman station. When the train stopped, the north end of the smoking car, in which the deceased was, was north of the north end of the station platform, and of the picket fence which lay east and west at the north end of that platform. One witness testified that the front end of the car passed the north end of the platform to within a short distance from its north end. The deceased took a seat near to the front end of the car. In addition to the company to which the deceased belonged, there were others who boarded the train at West Pullman, and the evidence tends to prove that the seats in the front car, in which the deceased rode, were all taken, and that some persons were standing. Wellman, witness for appellant, who was collector on the north-bound train and had charge of the first two cars, testified that a big crowd got on at Stewart Ridge, which is between West Pullman and Pullman. The evidence also tends to prove that there was a space of about eleven feet in length between the north end of the car and the north ends of the side seats, and that, in the sides of the car in this space, and about from four to six feet from the north end of the car, there were baggage doors, about four

feet in width. That the front platform of the front car was north of the fence at the north end of the station platform, is not contradicted. When the station was called the deceased arose and went through the front door of the car onto the front platform. The next seen of him by any one except the engineer of the south-bound train, hereafter mentioned, his body was found on the south-bound track under the third car from the engine of a south-bound train, which consisted of an engine and four cars. The distance from the north end of the station platform to the place where his body was found is variously estimated by the witnesses at from twenty feet to forty feet. The engineer and conductor of the south-bound train testified that the distance was forty feet. The tracks at Pullman and north from Pullman are straight. The north and south-bound trains had headlights, which were burning, and the south-bound train could be seen for a mile north of Pullman by one looking in that direction. The deceased was fourteen years and four months old at the time of the accident. He had been attending school from the time he was six years of age, and was in the eighth grade at the time of the accident. He was of average intelligence for his years and healthy. The north-bound train was due at Pullman at 7:45 o'clock and was on time. It was then dark.

Thomas C. Stodd, apparently a fair and very intelligent witness, who was acquainted with the deceased, and who went to where the body was, as soon as the accident occurred, testified that it was dark and that he "had to take a lantern to see who the boy was." All the witnesses examined on the question testified unhesitatingly that it was dark, except the fireman of the south-bound train, who testified that "it was not dark, it was moonlight," but on being asked the following question, answered it as follows:

Q. "You could see without a torch if it had been moonlight?" A. "No, you could not see without a light."

Cummings, the engineer of the south-bound train, testified: "I went back to where the boy was and *lighted a torch*, and went down in front of the engine to see whether

there was anything there, and then went back.  He was along back under the third car, just back under the third truck."

Melvin, a witness for appellee, testified that the only lights which would throw light on the tracks were the switch lights, and that the nearest signal light north of the station platform was two or three blocks away from it. The engineer of the north-bound train testified that the length of the station stop at Pullman was probably a minute or a minute and a half; and that the schedule time for leaving was 7:47, so that there were two minutes between the time the train stopped at Pullman, 7:45 o'clock, and the schedule time for leaving there.  But he further testified that the stops were controlled altogether by the number of passengers getting on or off.  The fireman on the north-bound train testified that the train stopped at Pullman about a minute and a half.  The south-bound train was due at Pullman at 7:43 o'clock, two minutes before the north-bound one was due, and, in fact, arrived there.  The engineer of the south-bound train testified that the train was a few minutes late at Pullman, and the conductor of that train testified that the train, in going into Pullman, was three or four minutes late.  The speed of the south-bound train, as it approached Pullman, was from twelve to fifteen miles per hour.  The engineer and fireman testified that the bell of the engine was continuously ringing for a distance of about half a mile north of Pullman, as the train was approaching that station. The engineer testified that, as he was pulling into Pullman, he noticed a person on the track, apparently about twenty-five feet in front of the engine, who "appeared from his crouched position to be running south," and that he applied the brakes, pulled the whistle and made one long blast, and that there was nothing more that he could do.  It is apparent from the evidence that the train could not have been stopped so as to avoid injury to the boy, after the engineer saw him on the track.  The engineer, on cross-examination, testified: "The space

required to stop an ordinary train, such as I had that night, after applying the brakes, would be about 450 feet." This witness also testified that the north-bound train was at the station when he was coming in and when he noticed the person on the track. The fireman of the south-bound train testified that as the train was coming into Pullman there was a headlight standing there, and that he saw a crowd on the platform, some of whom had uniforms on. The conductor of the south-bound train testified that as the train moved into the station he saw a crowd getting off the other train. Carlson, a passenger on the north-bound train, testified that he saw the south-bound train pulling into the station a few seconds after the north-bound train had stopped, and that the passengers had not all gotten off the north-bound train when the other train came in.

W. A. HOWETT, for appellant; J. G. DRENNAN, of counsel.

NOVAK & NOVAK, for appellee.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

The foregoing statement of facts is fully sustained by the evidence, and the evidence is, as we think, amply sufficient to warrant the jury in finding that appellant was guilty of negligence which proximately caused the injury. The south-bound train, which ran over and killed the appellee's intestate, was due at Pullman two minutes before the north-bound train was due and arrived there, so that if the south-bound train had been on time, the trains must have passed south of Pullman, as it is fair to infer they usually did. But the south-bound train was about three or four minutes behind time, so that if the north-bound train made time to Pullman, which it did, there was a probability that the other train would pass it at Pullman or north of there. The engineer and conductor of the south-bound train must have known that train was late a sufficient distance north of Pullman to enable them to exercise such care in the operation of the train as to be able to stop it, for the safety

of passengers getting off or on the north-bound train at a station, and especially at such a station as Pullman, where all passengers coming from the depot to take a north-bound train, or leaving that train, had to cross the south-bound track. The evidence shows that the headlight of the south-bound train could be seen half a mile; but it also shows that the headlight of the north-bound train was burning, and if the former could, by reason of the straightness of the tracks, be seen half a mile, the latter could also, and the accident could have been avoided by careful operation of the south-bound train; and it was the duty of the engineer, his train being late, to have been on the lookout for the north-bound train. Whether he actually saw the headlight of that train does not appear; but if he was on the lookout, as was his duty, it would seem from the evidence that he must have seen it. His fireman testified that as the south-bound train was arriving at Pullman, he saw a headlight standing there. Yet the engineer ran his train at the rate of from twelve to fifteen miles per hour, in approaching Pullman, when, as he says, the train could not be stopped in a less distance than about 450 feet.

Much that is said in Pennsylvania Co. v. Reidy, 198 Ill. 9, affirming same v. same, 99 Ill. App. 477, is applicable in this case. Appellant's counsel do not contend that the south-bound train was not negligently operated. Their contentions are that the deceased was guilty of negligence which contributed to the injury; that the court erred in excluding evidence offered by appellant, and in its rulings on instructions, and that the sum awarded as damages is excessive.

It is contended that the deceased was negligent, in not discovering that the front platform of the smoking car in which he was riding was north of the station platform, and in not passing from the baggage door onto the platform. In view of the fact that appellant had displayed, in the car in which the deceased was riding, a notice to passengers to leave the car at the forward end, we cannot regard the contention that the deceased was negligent, in not obeying the

notice, otherwise than as illustrative of the weakness of appellant's case. The deceased could have rightfully alighted from the front platform, if not forbidden so to do by appellant, *a fortiori* he could when enjoined so to do by appellant.

It appears from the evidence that some of the passengers, who were near the front of the car, started toward the front door, for the purpose of alighting from the front platform, but having learned in some way, which does not appear, that the front of the car had passed the north end of the platform, they turned back, and some of them went through the west baggage door onto the station platform. But that door was not opened by any of the train crew, nor were any of the passengers requested by any of the crew to go through it. Carlson, a passenger on the smoking car, testified that he opened the baggage door, and Melvin, also a passenger in that car, testified that he saw the baggage door opened, and that the deceased had gone out onto the front platform before it was opened. Marshall, a passenger on the front car, testified that he saw a crowd trying to open the baggage car door, but, at that time the deceased had gone out of the front door. But even though the deceased had known that the front platform of the car had passed the station platform, and that the baggage door was open, he would not, as we think, be chargeable with negligence in view of appellant's injunction to leave the car at the front end, especially as that injunction was not countermanded. But it is contended that the deceased was guilty of want of exercising ordinary care, in going down the south-bound track, on his way to the station, that he might have gone west of that track safely; and, also, that had he looked north he would have seen the headlight of the south-bound train. It is not negligence, as matter of law, for one crossing a railroad track, not to look, to ascertain whether a train is approaching, but whether it is negligence is a question for the jury, in view of all the facts and circumstances in evidence. C. & N. W. Ry. Co. v. Dunleavy, 129 Ill. 132, 148. The deceased could not go to

the turnstile, through which he had to pass on his way from the railroad right of way, without crossing the south-bound track. The crossing of that track was part of the way provided by appellant to and from the north-bound track. Therefore, the deceased was not a trespasser in going onto the south-bound track.

It was not the fault of the deceased that he alighted from the front platform of the car where he did. He alighted there by the express direction of the appellant. When he alighted he was in the space between the two tracks and north of a fence at the north end of the station platform which prevented access to that platform; nor was it his fault that he got onto the south-bound track where he did. He, like all the other passengers, had to cross that track in going from appellant's right of way. That track, as Cummings, engineer of the south-bound train, testified, was elevated from sixteen to eighteen inches above the level or surface of the ground. The night was dark, and the deceased probably could not observe the character of the ground west of the track, but knowing that the track was level, he ran south along it, on his way to the approach to the turnstile. The relation between appellant and the deceased, and the duty of the former to the latter arising from such relation, are thus concisely stated in Pennsylvania Company v. McCaffrey, 173 Ill. 169, 173: "When appellee alighted, the relation between himself and appellant was that of passenger and carrier. This relation between a passenger and a railroad company does not cease upon the arrival of a train at the place of the passenger's destination, but the company is still bound to furnish him an opportunity to safely alight from the train. It is its duty, not only to exercise a high degree of care while the passenger is upon the train, but also to use the highest degree of care and skill, reasonably practicable, in providing the passenger a safe passage from the train. (Denver, etc., Railroad Co. v. Hodgson, 18 Col. 117; Chicago and Eastern Illinois Railroad Co. v. Chancellor, 60 Ill. App. 525.) Bishop in his work on Non-contract Law (Sec. 1086) says: 'The

tracks around the platforms, and places for entering and leaving the cars, * * * should be made safe and kept so.'"

The passengers, in passing from the train, had a right to assume that the way was safe and would be kept so while they were on their way, and could not, as we think, reasonably have anticipated that appellant would, while the train which they had just left was standing at the station, operate a train at the speed of from twelve to fifteen miles per hour, or at all, past the standing train and on the track which they had to cross. We think it was a question for the determination of the jury, in view of all the facts and circumstances in evidence, including the age, degree of intelligence and necessarily limited experience of the deceased, whether, in running south on the south-bound track, he could be charged with want of ordinary care.

Appellant's counsel complain that the court ruled against the following question, which was asked Dillon, the engineer of the north-bound train: "If you know, what is the custom as to aprons of all cars on the arrival of Blue Island trains at Kensington?" Kensington is the station next south of Pullman, and the station platform there is elevated, and we infer that the object of the question was to prove that the custom was to let down the apron there over the car platform steps, from which counsel would have the inference drawn that the apron was also down at Pullman. But counsel, in a previous part of his argument, says that it is immaterial whether the apron was down or up when the train stopped at Pullman, in which statement we agree; and, if immaterial, the question was properly overruled. On the other hand, if material, the question was properly overruled, because the question then would be whether the apron was, in fact, down at Pullman—not what the custom was at Kensington.

The fireman on the south-bound train was asked, "What, if anything, more was there that the engineer could have done, at that time, to have stopped the train, than he did do?" The time referred to in the question is when the en-

gineer saw the deceased on the track, about twenty-five feet distant from the engine. The evidence tends to prove, and the engineer testified, that he could have done nothing more than he did. This is not contradicted, and it is not claimed by appellee that the engineer could have stopped the train running at its then rate of speed, after he noticed the deceased on the track. The negligence was in not operating the train more slowly and cautiously, and in not keeping a lookout for the north-bound train, in view of the south-bound train being behind time. We think the question was properly ruled against.

We find no error in appellee's instructions complained of by appellant's counsel.

The appellant's 5th instruction, the refusal of which is claimed to have been erroneous, was properly refused. It concludes as follows: "But, before the plaintiff can recover, she must prove by competent testimony, and by a preponderance thereof, that the deceased was in the exercise of due care and caution for his own safety, at the time he received the injury; that is, the plaintiff must prove, by a preponderance of the evidence, that the deceased was exercising such care and caution for his own safety as a reasonably prudent person should have exercised, at the time and in the place, or your verdict should be for the defendant." The instruction, if given, would have imposed on the appellee the burden of proving that the deceased was bound to exercise as great care as an adult would have been bound to exercise in like circumstances. Such is not the law. Deceased was only bound to use such care as children of his age, capacity and intelligence are capable of exercising. City of Pekin v. McMahon, 154 Ill. 141, 154, and cases cited. The court fully instructed the jury as to the necessity of proof that the deceased exercised ordinary care.

Lastly, it is urged that the sum awarded as damages is excessive. The deceased was fourteen years and four months old when the accident occurred. His mother testified that he had been going to school since he was six

years old, and was in the eighth grade at the time of his·
death, and was healthy, bright and intelligent.   He left
him surviving his father, mother, and a sister aged twenty-
one years.   In City of Chicago v. Keefe, 114 Ill. 222, 230,
the court say:   "Parents, and even brothers, might reason-
ably expect, in many ways, to derive pecuniary benefit
from the continued life of the intestate, as of grace and
favor, if not of right, at any age of life, and our statute im-
poses the duty of support, in the event of their becoming
paupers, of the parent by the child, and of one brother or
sister by another brother or sister," and the court held
proper the refusal of an instruction framed on a different
theory.   See, also, McLean County Coal Co. v. McVey, 38
Ill. App. 158, 161, and Ry. Company v. Then, 159 Ill. 535, 539.
In the last case the Supreme Court, adopting the opinion
of the Appellate Court, approved an instruction concluding
thus:   "But the jury may consider the pecuniary benefits
which the next of kin may have derived from said deceased,
had she not been killed, at any stage of life."   We decline
to hold that the sum awarded as damages is excessive.

The judgment will be affirmed.

*Affirmed.*